**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CRYSTALLEX INTERNATIONAL CORP., | |
| Plaintiff, | C.A. No. 16-1007-LPS |
| v. | |
| PDV HOLDING, INC.; PETRÓLEOS DE VENEZUELA, S.A.; ROSNEFT TRADING S.A.; and GLAS AMERICAS, LLC, | Jury Trial Demanded |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff Crystallex International Corp. ("Crystallex"), by and through its attorneys, for its First Amended Complaint in the above-captioned action against Defendants PDV Holding, Inc. ("PDVH"), Petróleos de Venezuela, S.A. ("PDVSA"), Glas Americas, LLC ("Glas Americas"), and Rosneft Trading S.A. ("Rosneft"), collectively "Defendants," alleges as follows:

**NATURE OF THE ACTION**

1.      Defendant PDVH and Defendant PDVSA (collectively the "PDV Defendants"), along with a number of their affiliates and subsidiaries, have engaged in a years-long effort to evade their creditors and creditors of Venezuela by any means necessary.

2.      Crystallex is one such creditor.  On April 4, 2016, Crystallex obtained a nearly $1.4 billion arbitration award (the "Arbitration Award") against the Republic of Venezuela, issued by a tribunal established under the Additional Facility of the International Centre for the Settlement of Investment Disputes ("ICSID")—an organ of the World Bank.  This is the largest known outstanding award against the Republic of Venezuela.

3.      The award was confirmed by the Ontario Superior Court of Justice in July 2016, and a Canadian judgment of USD $1.202 billion plus interest and costs was issued.  An action seeking confirmation of the award is currently pending in the District Court of the District of Columbia (2016-cv-00661-RC).

4.      In an attempt to avoid ever having to pay Crystallex and its other creditors, Venezuela, through the PDV Defendants and their subsidiaries, initially attempted to sell its most vulnerable U.S.-based asset, CITGO Petroleum Corporation ("CITGO Petroleum"), in order to move the value of that company out of the United States and beyond the reach of creditors.

5.      When that effort failed, PDV Defendants knowingly participated in the monetization of PDVSA's interest in CITGO Petroleum through a complex series of bond offerings and dividend payments with the intent to evade creditors (the "2015 Fraudulent Transfer").  A declared dividend of $2.8 billion was paid from PDVH to PDVSA, and as a result of that transaction, Crystallex is currently prosecuting a fraudulent transfer claim against the PDV Defendants in this Court under Civil Action Number 15-1082-LPS ("Crystallex I").  On September 30, this Court rendered its decision denying PDVH's motion to dismiss Crystallex's fraudulent transfer claim.  PDVSA's motion to dismiss is currently pending.

6.      The PDV Defendants' fraudulent actions did not end with the 2015 Fraudulent Transfer.  Faced with the very real prospect that in deciding Crystallex I, the Court could and would enjoin further asset transfers, the PDV Defendants doubled down on their efforts to hinder and delay creditors from being able to collect the monies owed them.  Less than a month after the Court issued its decision denying PDVH's motion to dismiss Crystallex I, PDVH, without receiving any consideration in return, agreed to give creditors of PDVSA a lien against 50.1% of

PDVH's shares in its most significant asset, CITGO Holding, in support of more than $3 billion in new debt issued by PDVSA.  PDVSA is a transferee of the fraudulent transfer by PDVH.

7.     Specifically, on or about October 24, 2016, PDVH executed the "Bond Swap Fraudulent Transfer."  At that time, PDVSA concluded a debt swap exchanging $2.8 billion in bonds maturing in 2017 for $3.367 billion in new bonds maturing in 2020, without receiving any consideration in return.  PDVH granted PDVSA's new 2020 bond-holders collateral in the form of a 50.1% lien on its shares in CITGO Holding—its most valuable asset—for no consideration.

8.     Defendant Glas Americas is the collateral agent and secured party for the 50.1% lien, which is documented by a UCC-1 filing recorded with the Delaware Secretary of State on October 28, 2016.  Glas Americas is a transferee of the fraudulent transfer by PDVH.

9.     On November 30, 2016, barely one month later, another UCC-1 was filed against PDVH's shares of CITGO Holding.  The new lien covered the remaining 49.1% of the outstanding stock.  Again PDVH agreed to pledge its assets for no consideration, this time in support of an agreement between Rosneft, PDVSA, and PDVH's sister, PDVSA Petróleo, S.A. ("PPSA").

10.    Rosneft is the secured party for the 49.1% lien.  Rosneft is a transferee of the fraudulent transfer by PDVH.

11.    By PDVSA's own admission, these transactions were undertaken for the benefit of PDVSA, not PDVH.  On December 23, 2016 PDVSA issued a press release confirming that, in October, it had "leveraged itself . . . using as collateral 50.1% of Citgo for the bond swap operation."

12.    In the same press release, PDVSA confirmed that is had now "used the remaining 49.9% [of Citgo] to raise new financing" from Rosneft.  Based on press reports, PDVSA appears

to have received approximately $1.5 billion in loan proceeds from Rosneft in exchange for the lien on PDVH's shares.

13.      As a result of these transactions, PDVSA and PDVH have pledged all of the value of CITGO Holding in furtherance of their persistent efforts to evade Crystallex and their other creditors.

14.      Each of these transactions wears several badges of fraud and is done with the intent to hinder and delay Crystallex in collecting on any judgment enforcing the Arbitration Award as well as any judgment this Court may issue in Crystallex I.  The PDV Defendants are relentless in their determination to avoid their obligations and remove assets from the reach of U.S. courts as part of an ongoing scheme to frustrate the enforcement of final and binding arbitration awards and any future judgments of this Court.  Their actions, however, are illegal and should be stopped.

## PARTIES

15.      Plaintiff Crystallex International Corp. is a Canadian corporation with its principal place of business at 8 King Street East, Suite 1201, Toronto, Ontario M5C 1B5 Canada.

16.      Defendant PDV Holding, Inc. is a Delaware corporation with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.  PDVH is a wholly-owned direct subsidiary of Defendant PDVSA, a foreign corporation wholly owned and controlled by Venezuela.  PDVH, in turn, wholly owns CITGO Holding, a Delaware corporation with the same address.

17.      Defendant Petróleos de Venezuela, S.A. is a foreign corporation wholly-owned and controlled by Venezuela.  PDVSA's principal place of business is in Caracas, Venezuela. PDVSA does not purport to have a registered office or principal place of business within the

United States.  PDVSA is an instrumentality of the nation of Venezuela for purposes of the Foreign Sovereign Immunities Act.

18.     Defendant Rosneft Trading S.A. is a private Swiss corporation with its principal place of business at Place du Lac 2, 1204 Geneva, Switzerland.

19.     Defendant Glas Americas LLC is a New York limited liability company with its principal place of business at 230 Park Avenue, Suite 1000, New York, New York 10169.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over the entire action pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1367.  PDVSA is a "foreign state" as defined under 28 U.S.C. § 1603—specifically, it is an "agency or instrumentality of a foreign state" as defined in 28 U.S.C. § 1603(b).  Under 28 U.S.C. § 1605, PDVSA is not immune from the subject matter jurisdiction of this Court because this action is based upon (i) PDVSA's commercial activity in the United States; (ii) at least one act performed by certain of the Defendants in the United States in connection with PDVSA's commercial activity elsewhere; and/or (iii) at least one act committed outside the territory of the United States in connection with PDVSA's commercial activity elsewhere, where that act caused a direct effect in the United States.

21.     Personal jurisdiction in this District over PDVSA is proper pursuant to 28 U.S.C. § 1330(b) and 28 U.S.C. § 1608.

22.     Personal jurisdiction in this District is proper over PDVH pursuant to 8 *Del. C.* § 321(a), 10 *Del. C.* § 3111, and Federal Rule of Civil Procedure 4(k).

23.     Personal jurisdiction in this District is proper over Rosneft pursuant to 10 *Del. C.* § 3104 and Federal Rule of Civil Procedure 4(k).

24.     Personal jurisdiction in this District is proper over Glas Americas pursuant to 10 *Del. C.* § 3104 and Federal Rule of Civil Procedure 4(k).

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (f) as PDVH resides in this District.  Further, a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

26.     This case arises from two archetypical fraudulent transfers.  During the pendency of a separate lawsuit brought by Crystallex, in exchange for no consideration, and for the benefit of an insider, Defendant PDVH has transferred 100% of its interests in CITGO Holding to secure PDVSA's debts.

**A.     The Underlying Debt: An Arbitral Award of Approximately $1.4 Billion Arising From Venezuela's Expropriation of Crystallex's Assets**

27.     On September 17, 2002, Crystallex entered into a Mining Operation Agreement ("MOA") with Corporación Venezolana de Guayana ("CVG"), a Venezuelan state-owned and state-run company to engage in gold mining and exploration.  Through the MOA, Crystallex acquired comprehensive and exclusive rights to explore, develop a mine on, exploit, and sell gold from Las Cristinas, one of the world's largest yet un-mined gold reserves.  Notwithstanding its other ventures, these exclusive rights were Crystallex's principal assets.

28.     Following Crystallex's substantial investment in the Las Cristinas mine, CVG unilaterally terminated the MOA on February 3, 2011.  Having thus expropriated Crystallex's assets, Venezuela took possession of the Las Cristinas mine in April 2011.

29.     In August 2011, the late Venezuelan President Hugo Chavez nationalized gold production within the country's borders.

30.     Venezuela subsequently announced that PDVH's parent company, PDVSA, would hold Crystallex's interests in Las Cristinas through an affiliate.  PDVSA then sold 40% of

its interest in Las Cristinas to the Venezuelan Central bank in exchange for approximately $6.9 billion.

31.     Crystallex, meanwhile, was forced to file for reorganization.  Its share price dropped to 15 cents and the company was delisted from the Toronto Stock Exchange and other foreign exchanges.

**B.     ICSID Arbitration**

32.     On February 16, 2011, Crystallex filed a request for arbitration against Venezuela under the ICSID Additional Facility Rules seeking compensation for the full value of its investments.

33.     On April 4, 2016, the arbitral tribunal issued an award in the amount of approximately $1.4 billion in Crystallex's favor, finding that Venezuela had expropriated Crystallex's assets.

**C.     The PDV Defendants' Initial Fraudulent Transfer: The "2015 Fraudulent Transfer"**

34.     In advance of the arbitral tribunal's award, the PDV Defendants, along with Venezuela and CITGO Holding, began their efforts to shield assets from attachment and execution by Crystallex and other creditors.

35.     CITGO Petroleum is Venezuela's most significant asset in the United States, with revenues of over $42 billion and earnings of $1.8 billion in 2013 alone.  As Venezuela was well aware, this made CITGO Petroleum a natural target for judgment creditors, including ICSID arbitration award holders.  As its first effort to avoid enforcement of any arbitration award, Venezuela attempted to sell CITGO Petroleum.  Unsuccessful in this effort, Venezuela devised a scheme to monetize its interests in CITGO Petroleum and transfer the value of that asset through PDVH and out of the country to PDVSA.

36.     PDVSA directed PDVH, its wholly-owned subsidiary, to direct its wholly-owned subsidiary CITGO Holding to issue $2.8 billion in debt, almost all of which CITGO Holding then proceeded to transfer, without any consideration, to its immediate parent, PDVH, as a stockholder dividend.  CITGO Holding was forced to pay a 12 percent interest rate in order to borrow the $2.8 billion and the bonds were rated as non-investment grade, or "junk," bonds by all three major ratings agencies from the moment that they were issued.  The debt offering had no legitimate business purpose.  Upon receiving these funds, PDVH paid its own dividend equal to what it received from CITGO Holding to its immediate Venezuela-based and Venezuela-owned parent, PDVSA.   Both dividends were transfers to insiders.   The net result of these activities was that Venezuela (through PDVSA and its subsidiaries) repatriated $2.8 billion in proceeds, while leaving its U.S.-based subsidiary, CITGO Holding, insolvent on an accounting basis, all while Venezuela was facing dozens of arbitrations and litigation seeking billions of dollars in recoveries.

**D.     Crystallex's Pending Lawsuit Against the PDV Defendants**

37.     On November 23, 2015, Crystallex filed Crystallex I.  Crystallex alleged, *inter alia*, that the PDV Defendants' efforts described above evidenced the following badges of fraud:

i.     The debt proceeds were transferred from CITGO Holding to PDVH, which controls CITGO Holding and is thus an "insider."

ii.     The debt proceeds were subsequently transferred from PDVH to PDVSA, which controls PDVH (and CITGO Holding) and is thus an "insider."

iii.     By moving assets from its indirect U.S.-based subsidiary to its own coffers, PDVSA retained control of the transferred debt proceeds and merely moved them offshore.

8

iv.  Before causing the transfer through the purported "dividend" payouts, Venezuela had either already been sued or threatened with suits predicted to result in billions of dollars in arbitral awards against it.  In addition, Venezuela itself expressly and publicly recognized that CITGO Petroleum's assets would be the primary targets for the enforcement of any unpaid arbitral awards.

v.  PDVSA not only retained control but also "removed" the debt proceeds from the United States by moving offshore the monetized value of CITGO Petroleum, a domestic Delaware corporation whose assets and/or shares could readily be attached and executed upon to pay arbitral awards against Venezuela.

vi.  No consideration was exchanged for the transfer of the debt proceeds.  PDVH received no consideration for the nearly $2.8 billion dividend it paid, and PDVSA offered nothing in exchange for receiving that dividend.

vii.  Venezuela publicly expressed its intent not to pay any arbitral award resulting from its expropriation of investments, as well as its intent to monetize its interest in CITGO Petroleum, located in the United States, to avoid their seizure in fulfillment of such awards.

viii.  The transfer of the debt proceeds to PDVSA rendered CITGO Holding— PDVH's main asset—insolvent on an accounting basis.  The debt incurred by CITGO Holding through the bond issuance and loan facility created negative shareholder equity.

ix.   The transfer of the near-$2.8 billion occurred shortly after CITGO Holding incurred a substantial debt nearly identical to that amount.

x.   CITGO Holding incurred the $2.8 billion in debt just months after PDVSA ended its unsuccessful attempt to sell its subsidiary, CITGO Petroleum.

38.   On September 30, 2016, the District Court for the District of Delaware denied PDVH's motion to dismiss Crystallex I as against PDVH.   The Court held that Crystallex's complaint asserting that PDVH's transfer of the declared $2.8 billion dividend to PDVSA alleged a violation of DUFTA.   The Court held that PDVH, "a non-debtor transferor of debtor property, is an appropriate defendant."

39.   PDVSA's motion to dismiss Crystallex I is currently pending.   Argument on that motion was held before the Court on December 22, 2016.

**E.   The "Bond Swap Fraudulent Transfer"**

40.   Shortly after the Court issued its decision denying PDVH's motion to dismiss Crystallex's fraudulent transfer claim, the PDV Defendants engaged in a second fraudulent transfer, this time encumbering slightly more than half of PDVH's primary asset in an effort to dodge Crystallex and other creditors.   Through this Bond Swap Fraudulent Transfer, the PDV Defendants seek to hinder the future enforcement of any judgment in Crystallex I.

41.   Shortly after the oral argument on PDVH's motion to dismiss Crystallex I, by an undated offering circular released in September 2016, PDVSA announced that it would offer to conduct a bond swap, utilizing PDVH's assets as collateral.

42.   As initially proposed, through the bond swap PDVSA would exchange more than $7 billion of outstanding PDVSA bonds for "New Notes," maturing in 2020, backed by PDVH's pledge of a first-priority lien in favor of PDVSA bondholders on 50.1% of PDVH's capital stock

of CITGO Holding.  The original early tender deadline for this swap was set for September 29, 2016.

43.     Having failed to generate sufficient interest in the swap, PDVSA announced on September 27, 2016 that it would increase the consideration paid to bondholders in the proposed swap and extended the early tender deadline to October 6, 2016.  As "sweetened," PDVSA offered consideration of 1.17 times or 1.22 times the face value of its existing April 2017 and November 2017 notes respectively, in exchange for the longer-maturity notes.  Following a further delay, PDVSA announced its debt swap had concluded on October 24, 2016.  Ultimately, creditors representing $2.8 billion worth of bonds maturing in 2017 tendered their notes for approximately $3.367 billion in new bonds maturing in 2020.

44.     PDVH's interest in CITGO Holding was pledged as collateral to Defendant Glas Americas, as the collateral agent (and a transferee of the Bond Swap Fraudulent Transfer), in accordance with the original offer to the new 2020 bondholders.  The Settlement Date for the exchange was on or about October 27, 2016.

45.     The offering circular does not mention any consideration flowing to PDVH in exchange for its extraordinary pledge of 50.1% of CITGO Holding.  Instead, it warns that "PDVSA cannot guarantee that a creditor of the Bolivarian Republic of Venezuela will not be able to interfere with the Exchange Offers, the Collateral or payments made under the New Notes, through an attachment of assets, injunction, temporary restraining order or otherwise."

46.     The form of pledge agreement by which PDVH is offering up its shares is silent as to any consideration for the pledge of a substantial portion of PDVH's assets.

47.     PDVH's transfer of its interest in CITGO Holding to Glas Americas could prove disastrous for PDVH.  Just prior to the transfer, the Financial Times reported:

Even if enough bondholders sign up, and the legality of the collateral pledge goes unchallenged, Citgo may prove scant security.  If PDVSA defaults on the new bonds then investors can seize 50.1 per cent of the US petrol company, but this would trigger a "change-of-control" clause in Citgo's own $5bn of debt, making it immediately payable.

48.     In other words, if the lien on PDVH's shares of CITGO Holding is ever called, it will destroy the value of PDVH's largest asset.

49.     Yet, this did not stop PDVH from agreeing to offer its assets to Glas Americas (as the collateral agent to the bondholders) solely for the benefit of PDVSA, an insider, without receiving any consideration in return, *see* 6 *Del. C.* § 1301(7)(b).

50.     As the recipient and current holder of the fraudulently transferred security interests, Glas America is a transferee under DUFTA.

51.     In fact, PDVSA announced on December 23, 2016 that it directed both the Bond Swap Fraudulent Transfer and that the fraudulent transfer was made to benefit PDVSA.  In its press release, PDVSA stated:

> Just as PDVSA ***leveraged itself*** in October using as collateral 50.1% of Citgo for the bond swap operation, in the midst of attacks against the company and a downturn in the global oil industry, ***it has used*** the remaining 49.9% to raise new financing.

(emphasis added).

52.     Glas Americas agreed to serve as collateral agent and filed the UCC-1 notwithstanding the fact that it was on notice of the Crystallex's claims, as demonstrated by the disclosure of the pendency of Crystallex I in the 2020 bond offering circular.

## F.     The "Rosneft Fraudulent Transfer"

53.     In or around November, 2016, after the Court denied PDVH's motion to dismiss Crystallex I, PDVH further encumbered its largest asset, CITGO Holding, by granting to Rosneft

12

a lien on the remaining 49.9% of its shares in CITGO Holding, for no consideration. Rosneft is a transferee of the fraudulently transferred security interest under DUFTA.

54.     According to press reports, in exchange for this pledge of PDVH's shares, PDVSA, not PDVH, received $1.5 billion in loan proceeds.

55.     Neither PDVSA nor PDVH revealed this transfer of the remainder of PDVH's unencumbered interest in CITGO Holdings to the Court at the Hearing on December 20, 2016 even though the UCC-1 had been filed by Rosneft on November 30, 2016

56.     When the fraudulent transfer of PDVH's assets to Rosneft became public, PDVSA issued a press release, which effectively acknowledged that it was the recipient of the Rosneft loan proceeds.

57.     In its press release, PDVSA stated, among other things, that it remained the owner of CITGO and that "it [PDVSA] has used the remaining 49.9% [of CITGO] to raise new financing."

58.     Rosneft knew or should have known that PDVH's lien was transferred for no consideration to PDVH during the pendency of Crystallex I.

59.     Through the Rosneft Swap Fraudulent Transfer, the PDV Defendants seek to hinder the future enforcement of any judgment in Crystallex I as well as the instant action.

60.     The Rosneft Swap Fraudulent Transfer, made during the pendency of both Crystallex I and the instant action, was made solely for the benefit of PDVSA, an insider, *see* 6 *Del. C.* § 1301(7)(b).

61.     The Rosneft Swap Fraudulent Transfer effectuated the PDV Defendants' goal of extracting all of the remaining value out of CITGO in exchange for billions of dollars in cash, which is now in the hands of PDVSA in Venezuela.

13

## FIRST CAUSE OF ACTION
### Fraudulent Transfer in Violation of
### The Delaware Uniform Fraudulent Transfer Act (DUFTA)
### (Against PDVH, PDVSA and Glas Americas)

62.     Crystallex repeats and incorporates the allegations set forth in Paragraphs 1 through 48 as though fully set forth herein.

63.     The Delaware Uniform Fraudulent Transfer Act (DUFTA), 6 *Del. C.* § 1301 *et seq.*, provides that a "Transfer" "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes . . . creation of a lien or other encumbrance." 6 *Del. C.* § 1301(12).

64.     Further, a transfer is "fraudulent" as that term is used in the act, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor, *id.* § 1304(a).  And in determining such actual intent, courts look to the non-exclusive badges of fraud delineated in the statute, *see id.* § 1304(b), and other considerations.

65.     Despite the pendency of Crystallex's action against the PDV Defendants arising from the 2015 Fraudulent Transfer, the PDV Defendants have engaged in a further fraudulent transfer, the Bond Swap Fraudulent Transfer, by creating a lien on PDVH's assets with the intent to hinder and delay Crystallex's ability to execute any judgment against the PDV Defendants that Crystallex may obtain in Crystallex I.  The Bond Swap Fraudulent Transfer bears several badges of fraud, including but not limited to:

     i.    The transfer was made during the pendency of Crystallex I;

    ii.    No consideration was exchanged for the transfer.  PDVSA's offering circulars make no mention of any consideration paid to PDVH in exchange for PDVH agreeing to a lien against 50.1% of its most significant asset, CITGO Holding;

      iii.    The transfer was made at the direction and for the benefit of PDVSA, which owns and controls PDVH, and is thus an "insider;" and

      iv.    PDVH completed the transfer just weeks after the District Court for the District of Delaware's denial of PDVH's motion to dismiss Crystallex I.

66.    Crystallex is therefore entitled to the relief specified in DUFTA, *see* 6 *Del. C.* §§ 1307, 1308, against the PDV Defendants' fraudulent transfer, particularly, a declaration that PDVH's pledge of a lien on 50.1% of its shares in CITGO Holding constitutes a fraudulent transfer, an order directing the cancellation of the transfer, and a receiver appointed over the transferred assets or a money judgment equal to the value of the transfer should the lien not be cancelled.  Crystallex also seeks an injunction barring any further transfers from the PDV Defendants as well as any further transfer of an interest in the subject assets—50.1% of PDVH's shares of CITGO Holding—from Glas Americas.

## SECOND CAUSE OF ACTION
### Fraudulent Transfer in Violation of
### The Delaware Uniform Fraudulent Transfer Act (DUFTA)
### (Against PDVH, PDVSA and Rosneft)

67.    Crystallex repeats and incorporates the allegations set forth in Paragraphs 1 through 53 as though fully set forth herein.

68.    Despite the pendency the action against Defendant PDVH arising from the Bond Swap Fraudulent Transfer and the pendency of Crystallex I and Crystallex's claims arising from the 2015 Fraudulent Transfer, Defendants have engaged in a further fraudulent transfer, the Rosneft Swap Fraudulent Transfer, by creating a lien on the remaining 49.9% of PDVH's interest in CITGO Holing with the intent to hinder and delay Crystallex's ability to execute any judgment against PDVH and PDVSA obtained in the pending Crystallex I or against PDVH in this action.

15

69.     The Rosneft Swap Fraudulent Transfer bears several badges of fraud, including but not limited to:

      i.    The transfer was made during the pendency of Crystallex I;

      ii.    The transfer was made during the pendency of the instant action (prior to the filing of this amended complaint);

      iii.    PDVH received no consideration for allowing the lien to be placed on its assets;

      iv.    The transfer was made at for the benefit of PDVSA, which owns and controls PDVH, and is thus an "insider;"

      v.    The transfer was concealed from Crystallex and this Court until revealed in the press; and

      vi.    The transfer involved substantially all of PDVH's remaining assets.

70.     Crystallex is therefore entitled to the relief specified in DUFTA, *see* 6 *Del. C.* §§ 1307, 1308, against Defendants' fraudulent transfer, particularly, a declaration that PDVH's pledge of a lien on 49.9% of its shares in CITGO Holding constitutes a fraudulent transfer, an order directing the cancellation of the transfer, and a receiver appointed over the transferred assets or a money judgment equal to the value of the transfer should the lien not be cancelled. Crystallex also seeks an injunction barring any further transfers from the PDV Defendants as well as any further transfer of an interest in the subject assets—49.9% of PDVH's shares of CITGO Holding—from Rosneft.

## **PRAYER FOR RELIEF**

WHEREFORE, Crystallex respectfully requests judgment against Defendants be entered as follows:

16

i.      Declaring that PDVH's pledge to issue a lien against 50.1% of its shares of CITGO Holding (the Bond Swap Fraudulent Transfer) constitutes a fraudulent transfer;

ii.      Declaring that PDVH's pledge to issue a lien against 49.9% of its shares of CITGO Holding (the Rosneft Swap Fraudulent Transfer) constitutes a fraudulent transfer;

iii.      Avoiding the Bond Swap Fraudulent Transfer;

iv.      Avoiding the Rosneft Swap Fraudulent Transfer;

v.      Appointing of a receiver to take charge of the transferred property (or other property of the PDV Defendants); or

vi.      Awarding money damages, including pre-and-post judgment interest, against the Defendants, such amount to be proven at trial;

vii.      Enjoining the PDV Defendants from further attempts to transfer assets without consideration;

viii.      Enjoining Rosneft and Glas Americas from taking any action to enforce or transfer their respective security interests in the shares of CITGO Holding; and

ix.      Granting such other and further relief as the Court may deem just or proper.

                                                      */s/ Travis S. Hunter*
                                                      Raymond J. DiCamillo (#3188)
                                                      dicamillo@rlf.com
                                                      Jeffrey L. Moyer (#3309)
                                                      moyer@rlf.com
                                                      Travis S. Hunter (#5350)
OF COUNSEL:                                           hunter@rlf.com
                                                      RICHARDS, LAYTON & FINGER, P.A.
Robert L. Weigel                                      One Rodney Square
Jason W. Myatt                                        920 North King Street
Rahim Moloo                                           Wilmington, Delaware  19801
GIBSON, DUNN & CRUTCHER LLP                           (302) 651-7700
200 Park Avenue
New York, New York 10166                              *Attorneys for Plaintiff*
(212) 351-4000


Dated: January 4, 2017